1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CENTER FOR BIOLOGICAL DIVERSITY, a          No. C 00-00927 WHA
     non-profit corporation; SIERRA CLUB, a non-
11   profit corporation; and PUBLIC EMPLOYEES
     FOR ENVIRONMENTAL
12   RESPONSIBILITY, a non-profit corporation,    **ORDER DENYING THIRD-
                                                   PARTY MOTION FOR CIVIL
13              Plaintiffs,                         CONTEMPT**

14        v.

15   BUREAU OF LAND MANAGEMENT,

16              Defendant.

17   HIGH DESERT MULTIPLE USE
     COALITION, DESERT VIPERS
18   MOTORCYCLE CLUB, SAN DIEGO OFF-
     ROAD COALITION, CALIFORNIA
19   ASSOCIATION OF 4-WHEEL DRIVE
     CLUBS, and THE BLUE RIBBON
20   COALITION,

21              Defendant-Intervenors.
                                              /
22

23                              **INTRODUCTION**

24        In this action under the Endangered Species Act, third parties Little Chief Millsite

25   Partnership and the Owners of Independence Millsite move to hold defendant Bureau of Land

26   Management in contempt.  Proponents are owners of land accessible only by crossing

27   federally-owned lands that were the subject of the consent decree entered in this action between

28   defendant and plaintiffs Center for Biological Diversity, Sierra Club, and Public Employees for

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   Environmental Responsibility.  BLM has denied proponents' requests for motor-vehicle access

2   to their property.  The consent decree did not give any affirmative right for inholders to have

3   motor-vehicle access to their land.  Accordingly, proponents' motion is **DENIED.**

**STATEMENT**

5       This motion concerns an area called Surprise Canyon, located in Southern California's

6   Mojave Desert within the California Desert Conservation Area.  The California Desert

7   Conservation Area is an expanse of approximately 25 million acres of land, with 10 million

8   acres of that administered by BLM.  Surprise Canyon was designated an Area of Critical

9   Environmental Concern in 1983.  *See* 48 Fed. Reg. 54, 290 (Dec. 1, 1983).

10      The bottom of the canyon has been used in the past as a route for travel to a now-

11  abandoned mining town.  The road through the canyon now leads to private inholdings within

12  Death Valley National Park.  No other route for motorized vehicles exists to access those lands.

13  The canyon road washed out in 1984.  Thereafter in 1989, recreational vehicle enthusiasts

14  created their own road through the canyon by removing vegetation and building rock structures

15  in the waterfalls (Proponents' Exh. C at 2).  Perhaps 100 motorized vehicles used the

16  newly-created route per year, but BLM eventually found that those uses adversely affected

17  wildlife habitat, riparian areas, and water quality in the canyon (*id*. at 3, 7, 10, 12–13).  The

18  road itself is now in terrible shape.

19      The canyon itself is home to a number of rare wildlife species.  In 1994, the upper

20  portion of Surprise Canyon was added to Death Valley National Park to form the Surprise

21  Canyon Wilderness (Belenky Decl. Exh. 1 at 6).  In 2002, the BLM designated the Canyon

22  eligible for Congressional designation under the Wild and Scenic Rivers Act (*ibid*.).

23                    *          *          *

24      This action was originally filed on March 16, 2000.  The complaint alleged that

25  defendant was in violation of Section 7 of the Endangered Species Act for failing to enter into

26  formal consultation with the Fish and Wildlife Service regarding the adoption of the California

27  Desert Conservation Plan ("CDCA Plan") on threatened and endangered species.  Several

28  groups of off-road recreationists, Desert Vipers Motorcycle Club, San Diego Off-Road

1   Coalition, California Association of 4-Wheel Drive Clubs, and the Blue Ribbon Coalition, were

2   granted defendant-intervenor status in that action.

3          The case eventually settled after several rounds of negotiations and a series of

4   stipulations that ultimately became the consent decree.  On March 20, 2001, this Court entered a

5   consent decree and judgment in this action (Proponents' Exh. A).  Part of the consent decree

6   mandated closure of the road to Surprise Canyon.  The relevant provision stated (Proponents'

7   Exh. B, ¶ 46):

8                  By February 15, 2001, BLM shall institute an emergency closure,
                   via Federal Register notice publication, to motorized vehicle
9                  access in Surprise Canyon.  By May 1, 2001 BLM shall install a
                   locked gate in the vicinity of the south ½ of section 14 to block
10                 vehicle access to the canyon.  As soon as practicable, but no later
                   than July 1, 2001, BLM shall, following completion of public
11                 scoping, completion of a NEPA document, and concurrence of the
                   California Desert District Office, issue a decision document.  The
12                 NEPA document shall evaluate a full range of options for
                   management of human access to the area in Surprise Canyon
13                 beyond the gate. The decision document shall determine the
                   nature or conditions under which such access, if any will be
14                 allowed.  *Individuals owning private property in the vicinity of
                   Panamint City shall not be subject to the restrictions of this
15                 paragraph* . . . .

16  That provision went on to require security measures for the gate to close the road.

17         Thereafter, in May 2001, BLM published notice of its decision to close access to the

18  canyon for all motorized vehicles pursuant to 43 C.F.R. 8364.1 and based on an environmental

19  assessment.  The notice stated (Proponent's Exh. C):

20                 This closure order is issued to provide interim protection of the
                   riparian habitat, water quality, and sensitive wildlife resources
21                 and wilderness values within the Surprise Canyon ACEC until
                   such time when BLM completes a thorough review and analysis
22                 of various methods of access in Surprise Canyon and complies
                   with the processes required by the National Environmental Policy
23                 Act and the California Desert Conservation Area Plan.  This
                   interim closure will allow BLM to properly evaluate and arrive at
24                 a final decision on environmentally acceptable methods of access
                   in Surprise Canyon while protecting the canyon from further
25                 impact cause by the operation of off-highway vehicles.

26  66 Fed. Reg. 29163–64.  The National Park Service closed the upper portion of Surprise

27  Canyon, which was part of Death Valley National Park, to motorized vehicle use in 2002

28  (Belenky Decl. Exh. 2).  Since 2002, BLM has been engaged in a NEPA process regarding

                                              3

**United States District Court**
For the Northern District of California

1    long-term management of Surprise Canyon.  BLM issued a notice of intent to prepare an

2    environmental impact statement soliciting scoping comments from the interested public.

3    67 Fed. Reg. 37859.

4                            *                    *                    *

5           Not ever having been parties, proponents of this motion Little Chief Millsite Partnership

6    and Owners of Independence Millsite are owners of private property in Inyo County, California.

7    The property is completely surrounded by federal lands, including Death Valley National Park

8    and other lands administered by BLM.  Access to the upper portion of the road has been

9    restricted as it is part of Death Valley National Park.  Although proponents ask for keys to the

10   locked gate at the bottom of Surprise Canyon road, opening the lower portion of the road would

11   only allow them to get within approximately two miles of their property.

12          Proponents have been involved in a number of efforts to gain access for motorized

13   vehicles to Surprise Canyon road.  In 2002, eleven groups representing off-road vehicle

14   enthusiasts challenged BLM's decision to close Surprise Canyon in the United States District

15   Court for the Southern District of California.  *AMA District 37 Sports Committee et al. v. U.S.*

16   *Dept. of the Interior, et al.*, Case No. C 02-1998 (Brewster, J.).  The road closures were upheld

17   in an order dated April 29, 2004, holding that the interim closures were proper measures taken

18   to preserve the area while BLM determined long-term plans for use (Belenky Decl. Exh. 10 at

19   2).

20          In 2003, groups of off-road vehicle users bought old patented mining claims located

21   near Panamint City, ostensibly to gain motorized access to Surprise Canyon (*id*. at Exh. 4).

22   Several of these individuals, including proponents of this motion, submitted letters to the BLM

23   and the National Park Service requesting keys to the locked gate at the bottom of the road.

24   BLM performed a supplemental environmental analysis of the environmental effects of

25   allowing motorized access to the canyon (Def.'s Exh. 3).  BLM noted that more of the trail had

26   washed out after the closure destroying some vegetation, but that vegetation in other places had

27   returned where it had been removed to provide motor-vehicle access (*id*. at 5).  BLM concluded

28   that opening the road to motor-vehicle access could adversely affect approximately 20% of

                                                    4

**United States District Court**
For the Northern District of California

riparian vegetation, eventually lower the stream's water table, and increase erosion in the

streambed (*id*. at 12). Effects on water quality could possibly cause the stream to violate state

water-quality standards (*ibid*.).

BLM issued a decision record after the analysis was completed which denied

unqualified motor-vehicle access to the canyon to the public, including property owners (*id*. at

Exh. 1 at 2). The BLM's decision record explained (*id*. at 3):

> Landowners of the Independence Millsite have submitted a
> request or demand for a key to the locked gate across Surprise
> Canyon for the purpose of driving off-road vehicles across federal
> [land] in Surprise Canyon to access their recently acquired
> property. Their request, if granted, would result in appreciable
> disturbance or damage to federal lands and resources, and
> therefore cannot be considered a casual use activity. Thus, in
> order to further consider landowner requests to access their
> property by driving off-road vehicles through Surprise Canyon,
> they must apply for a permit or right of way under the provisions
> of 43 CFR 2800/2929 and 36 CFR 14. If an application is
> received, BLM will process it according to procedures in the
> regulations.
>
> Landowners may exercise their access rights to their property as
> casual users of the federal lands through hiking, through the use
> of pack animals, or by helicopter landing on their parcel of
> property.

The decision record also acknowledged the consent decree from the prior action (*id*. at 2):

> [The consent decree] does not exempt BLM from compliance
> with applicable laws and regulations in carrying out the
> provisions of the Court order. In the case of Surprise Canyon, the
> Consent Decree and Court Orders indicate that owners of private
> land in the vicinity of Panamint City <u>may</u> receive a key to a
> locked gate, and an agreement from the BLM in order to access
> their property. The Court Order does not exempt BLM from
> following legal and regulatory procedures in addressing the
> landowner access requests. At this time there is no basis for BLM
> issuing keys and establishing such an agreement because
> decisions regarding landowner access have not been made.

BLM, together with the National Park Service, informed proponents of the decision stating that

the agency would consider the request a pre-application proposal and gave proponents

information on how to apply for authorization to use the lands (*id*. at 2). The response also

informed proponents that they would have to choose between seeking a permit to use federal

lands or seeking a right-of-way, and included blank applications (*id*. at 3).

1    Little Chief Millsite Partners then submitted a request for rights-of-way over both BLM

2    and NPS lands.  The agencies contacted Millsite Partners on November 22, 2004, and informed

3    them that the applications would be processed pursuant to a schedule for a joint effort by the

4    agencies to analyze alternatives for vehicle route designations in Surprise Canyon (Def.'s

5    Exh. 2).  Proponents claim that BLM and NPS have refused to issue a final decision on their

6    application for rights-of-way in order to prevent them from appealing the decision.  They filed

7    this motion to hold BLM in contempt for failing to comply with the consent decree in this

8    action on August 6, 2007.

9                                             **ANALYSIS**

10   Courts have the inherent authority to enforce their orders by exercising their contempt

11   powers.  "Because of their very potency, inherent powers must be exercised with restraint and

12   discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  In a contempt proceeding, the

13   moving party has the burden of showing that by clear and convincing evidence that the

14   contemnors violated a specific and definite order of the court.  *Stone v. City and County of San*

15   *Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992).  The burden then shifts to contemnors to

16   demonstrate why they were unable to comply.  *Ibid.*  Failure to comply with a court order

17   consists of not taking all reasonable steps within contemnor's power to comply with the order.

18   *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989).  Present inability to

19   comply with a court order is a complete defense to charges of civil contempt.  *Donovan v.*

20   *Mazzola*, 761 F.2d 1411, 1417 (9th Cir. 1985).

21   With respect to this motion, no party disputes that proponents have not been given keys

22   to the gate and that proponents are currently unable to access their property using motorized

23   vehicles.  Plaintiffs and defendant argue that the consent decree gives proponents no right to

24   motor-vehicle access to Surprise Canyon road.

25      **1.    COMPLIANCE WITH THE CONSENT DECREE.**

26   Proponents of this motion argue that the consent decree gives them an affirmative right

27   to access their inholdings.  Because of that, so the argument goes, BLM must give them keys to

28   the gate.  The consent decree affirmatively required BLM to close the Surprise Canyon road to

motorized vehicles as of a certain date.  It also required them to take certain security measures such as installing a locked gate.  The consent decree provided an exception, stating that "[i]ndividuals owning private property in the vicinity of Panamint City shall not be subject to the restrictions of this paragraph . . . ." (Def.'s Exh. B, ¶ 46).  The exception reserved the issue of whether landowners could have access to inholdings.  It did not create an affirmative right for landowners to have motor-vehicle access to the Surprise Canyon road.  The provision was merely intended to indicate that the issue was not part of the consent decree and was left to future regulation.

Proponents make similar arguments with regard to the settlement agreement between plaintiffs and defendant on which the consent decree was based.  As with the consent decree, however, those agreements only created an exception for landowners to closing the road.  They did not affirmatively require that BLM give proponents of this motion motor-vehicle access or keys to the gate.  They merely severed the separate issue of whether and under what circumstances the inholders would be allowed access.

In the alternative, proponents argue that under the consent decree, BLM is required to follow the law, and that BLM has violated certain federal statutes by not allowing inholders motor-vehicle access.  The consent decree contains the following provision:  "In complying with the terms of this agreement, BLM shall be subject to all applicable federal statutes or regulations, and nothing in this agreement shall be construed to require BLM to take any actions in contravention of any such applicable statute or regulations" (Proponents' Exh. B, ¶ 56).  The order approving the consent decree stated that "[t]he consent decrees will not and may not be asserted as legal authority for any agency action over and above the BLM's existing statutory authority or to avoid any duties under NEPA" (*id.* at Exh. A, 13).

Proponents argue that BLM is violating the Federal Land Policy and Management Act, the Alaska Native Interest Land Act, and the California Desert Protection Act by not allowing them motor-vehicle access.  The FLPMA governs BLM's policy for granting rights-of-way.  43 U.S.C. 1764(c).  ANILCA and the CDPA address access to inholdings surrounded by federal lands.  ANILCA provides:

> Notwithstanding any other provision of law, and subject to such terms and conditions as the Secretary of the Interior may prescribe, the Secretary shall provide such access to nonfederally owned land surrounded by public lands managed by the Secretary under the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701–82) as the Secretary deems adequate to secure the owner the reasonable use and enjoyment thereof: *Provided* that such owner comply with rules and regulations applicable to access across public lands.

16 U.S.C. 3210(b).  Similarly, the CDPA provides:

> The Secretary shall provide adequate access to nonfederally owned land or interests in land within the boundaries of the conservation units and wilderness areas designated by this subchapter which will provide the owner of such land or interest the reasonable use and enjoyment thereof.

16 U.S.C. 410aaa-78.  Proponents contend that BLM has violated these statutes in contravention of the consent decree by not giving them motor-vehicle access to their land.

Proponents are essentially arguing that the consent decree requires that BLM's obligations under these laws trump its obligations under all others.  The consent decree does require that BLM must follow federal and state laws, but that requirement is limited to BLM's affirmative obligations under the consent decree.  This provision does not mean that by signing the consent decree, the agency agreed to submit to a roving obligation to comply with all laws concerning the subject lands.  Interpreting the consent decree in such a way would short-circuit the APA and would allow any person into court based on the consent decree.  All that was intended was that the affirmative obligations imposed by the decree were subject to the agency's duties imposed by statute.  Moreover, giving the inholders motor-vehicle access could run afoul of the agency's NEPA obligations under the consent decree.  The two foregoing reasons are sufficient by themselves to deny proponents' request for motor-vehicle access to the inholdings.  Accordingly, Little Chief Millsite Partnership and the Owners of Independence Millsite's motion to hold defendant in contempt is **DENIED**.

### 2. PROPONENTS' RIGHT-OF-WAY APPLICATION.

Proponents also argue that BLM violated the consent decree by requiring them to submit applications for permits or rights-of-way.  Again, this argument goes back to proponents' assertion that the consent decree confers some automatic affirmative right to have motor-vehicle

**United States District Court**
For the Northern District of California

1   access to the canyon road.  This is not so.  Along the same lines, proponents also argue that

2   prior to entry of the consent decree, BLM allowed them access.  Again, this helps their cause

3   little because BLM made the decision to close the canyon road to all motor traffic based on

4   findings that an emergency closure was necessary to evaluate the condition of the area and

5   develop a land-use plan pursuant to NEPA.

6          In the alternative, proponents point out that they filed applications for rights-of-way to

7   use the canyon road more than four years ago.  The agency has never issued a final action.

8   Proponents argue that the agency's failure to approve the rights-of-way constitutes a violation

9   of their right to access under FLPMA, ANILCA, and the CDPA.  Claims under those statutes

10  are not before the Court at this time.  Plaintiffs may still be able to bring a separate APA action

11  under those statutes and obtain relief.  The present motion, we must remember, is styled as an

12  attempt to enforce the decree, not as a new APA action.

13         Finally, proponents contend that they should get access under the consent decree

14  because BLM has violated the APA by delaying unreasonably in issuing final action on their

15  applications for rights-of-way.  Specifically, they assert that they should not have to wait until

16  BLM completes an environmental impact statement before getting a final decision.  In support

17  of this argument, they cite *Hale v. Norton*, 476 F.3d 694, 698 (9th Cir. 2007).  In *Hale*, the

18  Ninth Circuit held that requiring a NEPA process before acting on an application for right-of-

19  way was permitted under ANILCA.   The plaintiff's application was ultimately denied based on

20  data and conclusions from the NEPA process.  *Id.* at 700–01.  Proponents point out that the

21  delay in processing their right-of-way applications has been far longer than that in *Hale* —

22  nearly four years here compared with approximately nine weeks in *Hale*.  The delay in

23  processing proponents' applications here is certainly troublesome, but those claims are not

24  before the Court.

25         To tee up the issue, proponents must file a new lawsuit under the APA to compel agency

26  action, rather than seeking to enforce an old decree in someone else's case concluded years

27  before any agency action was requested by proponents.  With regard to any subsequent action,

28  there is nothing in the consent decree that requires the agency to allow access to the inholdings

**United States District Court**
For the Northern District of California

1  in question.  Nor is there anything in the consent decree that prohibits the agency from allowing

2  access.  The issue of access to the inholdings is left to agency action independent of the consent

3  decree.  Under no circumstances should the agency assert in a later or separate proceeding that

4  the consent decree restricts its ability to allow proponents access to the inholdings, especially

5  after the arguments it has advanced on this motion.  Accordingly, proponents' motion to hold

6  defendant in contempt is **DENIED**.

**CONCLUSION**

8       For all of the above-stated reasons, Little Chief Millsite Partnership and Owners of

9  Independence Millsite's motion to hold the Bureau of Land Management in contempt is

10  **DENIED**.

12       **IT IS SO ORDERED.**

14  Dated: September 17, 2007.

                                               _____

15                                                 WILLIAM ALSUP
                                               UNITED STATES DISTRICT JUDGE